1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10

11  WAYMAN ELLIS,                      )    Case No. 10cv1451-JLS (BLM)
                                       )
12              Plaintiff,             )    **REPORT AND RECOMMENDATION**
                                       )    **FOR ORDER GRANTING IN PART**
13  v.                                 )    **AND DENYING IN PART**
                                       )    **PLAINTIFF'S MOTION FOR**
14  MICHAEL J. ASTRUE, Commissioner of )    **SUMMARY JUDGMENT OR REMAND**
    the Social Security Administration,)    **AND DENYING DEFENDANT'S**
15                                     )    **CROSS-MOTION FOR SUMMARY**
                Defendant.             )    **JUDGMENT**
16                                     )
                                       )    [ECF Nos. 10 & 12]
17  _____   )

18          Plaintiff Wayman Ellis brought this action for judicial review of the Social Security

19  Commissioner's ("Commissioner") denial of his claim for disability insurance benefits.  Before the

20  Court are Plaintiff's Motion for Summary Judgment or Remand (ECF No. 10, "Pl.'s Mot.") and

21  Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion (ECF No.

22  12, "Def.'s Mot. & Opp'n").[1]

23          This Report and Recommendation is submitted to United States District Judge Janis L.

24  Sammartino pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(c) of the United States

25  District Court for the Southern District of California.  For the reasons set forth below, this Court

26  _____

27          [1] Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary
    Judgment appears on the docket as one document, document number twelve.  ECF No. 12.  However, Defendant's
    Response in Opposition also appears on the docket as a separate document, document number thirteen.  ECF No.
28  13.  For clarity, the Court will refer to Defendant's Cross-Motion and Opposition as one document, namely, document
    number twelve.

1 **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART AND**

2 **DENIED IN PART** and Defendant's Cross-Motion for Summary Judgment be **DENIED**.

3 **PROCEDURAL BACKGROUND**

4 On February 26, 2007, Plaintiff applied for Supplemental Security Income ("SSI") payments

5 based on disability pursuant to Title XVI of the Social Security Act ("Act"). Administrative Record

6 ( "AR") at 109-12. Although Plaintiff originally alleged a disability onset date of December 13,

7 1994, this date was later amended to correspond to his SSI application date of February 26,

8 2007.[2] Id. at 28, 109. The Commissioner initially denied Plaintiff's application in April 2007, and

9 again upon reconsideration that September, resulting in Plaintiff's request for an administrative

10 hearing. Id. at 46, 50, 53-56, 61-66, 68-70.

11 On August 11, 2008, a hearing was held before Administrative Law Judge ("ALJ") Edward

12 D. Steinman. Id. at 23-45. Plaintiff and a vocational expert testified at the hearing. Id. In a

13 written decision dated August 21, 2008, the ALJ determined that Plaintiff was disabled. Id. at 12-

14 22. However, because the ALJ also found that Plaintiff's substance use disorder was a contributing

15 factor material to the determination of his disability, the ALJ concluded that Plaintiff was not

16 disabled as defined by the Act. Id. at 12-22. Plaintiff requested review by the Appeals Council

17 and submitted additional evidence in support of his alleged disability. Id. at 5-6. In a letter dated

18 May 11, 2010, the Appeals Council found no basis for disturbing the ALJ's ruling, and the ALJ's

19 decision therefore became the final decision of the Commissioner. Id. at 1-3; see also 20 C.F.R.

20 § 404.981.

21 On July 12, 2010, Plaintiff filed the instant federal action, and on November 15, 2010,[3]

22 briefing was complete on the cross-motions for summary judgment currently before the Court.

23 See ECF Nos. 1, 9, 10, & 12.

24 ///

25 ///

26 ───────────────

27 [2] Plaintiff amended the onset date of his disability during his administrative hearing. AR at 28.

28 [3] The deadline by which Plaintiff had to file a reply to Defendant's Opposition and/or an Opposition to Defendant's Cross-Motion for Summary Judgment was November 30, 2010 (ECF No. 9), but because Plaintiff did not file any reply, briefing was complete as of November 15, 2010. See ECF No. 12.

**FACTUAL BACKGROUND**

**A.  Plaintiff's Education and Employment History**

Plaintiff was born on December 13, 1984, he has a twelfth-grade education, and he was 22 years old on February 26, 2007, the alleged onset of disability.  AR at 28, 109, 133, 460. Plaintiff testified that he worked in temporary jobs, but that his last employment was in 2003.[4] Id. at 26-28, 31, 133, 460.  Plaintiff explained that he does not live alone but "stay[s] with family."  Id. at 31.  Plaintiff also testified that he was incarcerated for a "minor robbery" from March 2007[5] to July 2007, and in February 2008, he served two weeks in jail because he violated his probation by testing positive for drugs.  Id. at 28-29.

**B.  Plaintiff's Medical History**

The following information, which was available to the ALJ prior to and/or as a result of Plaintiff's administrative hearing on August 11, 2008, provides the relevant basis for the ALJ's order issued on August 21, 2008.  AR at 9-23.

1. Young Ho Kang, M.D. (Psychiatrist) and Beatrice Lewis, L.C.S.W. (Senior Psychiatric Social Worker) - November 2006

On November 8, 2006, Dr. Young Ho Kang, a staff psychiatrist at the San Diego County Psychiatric Hospital, conducted a psychiatric assessment of Plaintiff.  AR at 196-198.   Plaintiff sought help "for his trouble staying in focus, as well as his explosive temperament problem."  Id. at 196.  A month prior to the assessment, Plaintiff had been placed on Depakene by another psychiatrist, but that was his only prescribed medication.  Id.  However, Plaintiff stated that he took Ritalin between ages 13 and 18 for his attention deficit hyperactivity disorder ("ADHD"), and used cannabis intermittently for the last 8-10 years.  Id.  Plaintiff's urine tested positive for cannabis on the day of the assessment.  Id.  Dr. Kang noted that Plaintiff had "[n]o thought of suicide or homicide and no reported hallucination or sign of paranoia or delusions," but Plaintiff

---

[4] The Record seems to indicate that Plaintiff worked as late as 2005 or 2006, therefore contradicting Plaintiff's testimony.  AR at 26, 110, 113-17, 128-29, 183.  Regardless, the ALJ determined at the administrative hearing that Plaintiff had "no prior work."  Id. at 28.

[5] Contrary to Plaintiff's testimony, the Record indicates that Plaintiff was arrested on April 13, 2007 for robbery and burglary.  AR at 59.

"seems to have experienced psychotic episodes in the past" and claims that "he has been hearing voices sometimes." Id. at 196-97. Dr. Kang diagnosed Plaintiff with: ADHD Not Otherwise Specified; Mood Disorder Not Otherwise Specified, Not Psychotic with Some Explosive Episodes; and Cannabis Dependence. Id. Dr. Kang also indicated the likelihood that Plaintiff also had a Personality Disorder Not Otherwise Specified, Mainly with Antisocial Features. Id. Finally, Dr. Kang assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 45. Id. Ultimately, Dr. Kang summarized that Plaintiff likely had significant ADHD as well as "problems associated with intermittently explosive episodes while abusing cannabis, which will further amplify [Plaintiff's ADHD] symptoms." Id. at 198. As a treatment plan, Dr. Kang advised Plaintiff to discontinue the Depakene, and he gave Plaintiff a prescription for Seroquel and Strattera. Id. Dr. Kang did not indicate whether he gave Plaintiff any instruction regarding his cannabis use.

In addition to the session with Dr. Kang, Senior Psychiatric Social Worker Beatrice Lewis evaluated Plaintiff.[6] Id. at 199-200. Although Dr. Kang noted that Plaintiff was "very reluctant to describe his problems," Ms. Lewis noted that Plaintiff said "the meds are shutting me down, I experienced voices, I feel unable to cope with even simple things by myself." Id. at 197, 199. Plaintiff also told Ms. Lewis that he had experienced auditory hallucinations since age 10, and "[h]e sometimes feels that persons on the radio or television are giving him orders." Id. at 199. Additionally, Plaintiff acknowledged that he had recently begun experiencing "extreme tactile hallucinations along with visual hallucinations of devils." Id. Plaintiff admitted that he is easily irritated and that he sometimes stays awake for days at a time, which are the symptoms that caused his aunt to bring him to the hospital. Id. When questioned about his drug use, Plaintiff admitted he had used cocaine in the past, but denied any other drug use, and Ms. Lewis noted that he was "very defensive about his past drug use." Id. Ms. Lewis "impressed upon [Plaintiff] that street drugs will cause his prescribed medications to be ineffective." Id. at 200.

San Diego County Psychiatric Hospital staff referred Plaintiff to the East County Mental Health Clinic, where he had an appointment on November 15, 2006. Id. At this appointment,

---

[6] Although Ms. Lewis erroneously referred to the client as "Ellis Mayman," the Court construes this to mean Plaintiff, Mr. Ellis Wayman. See AR at 199-200.

10cv1451-JLS (BLM)

Plaintiff's urine screen was not conducted because Plaintiff indicated that he would test positive for marijuana.  Id. at 203.

> 2. Carmelita P. Barros, M.D. (Psychiatrist) and various Registered Nurses - December 2006 through July 2008

Dr. Barros began treating Plaintiff in December 2006.  AR at 31, 204.  On December 28, 2006, Dr. Barros conducted a psychiatric evaluation of Plaintiff, which resulted in the following tentative diagnosis: Psychotic Disorder Not Otherwise Specified; Depressive Disorder Not Otherwise Specified; ADHD; and Cannabis Abuse.  Id. at 204.  Dr. Barros noted the need to "rule out" Cannabis Dependence and Schizoaffective Disorder, assigned Plaintiff a GAF score of 40, and advised Plaintiff to continue taking his Seroquel and Strattera.  Id.

In a follow-up appointment on January 4, 2007, Plaintiff tested positive for marijuana and negative for all other substances.  Id. at 205.  Plaintiff stated he uses marijuana two times per week, but he does not use other substances.  Id.  Plaintiff said his medication makes him feel tired, but it also "calms him down and decreases his tendency to get angry."  Id.  However, Plaintiff said he "sometimes hears voices or sees things usually at night."  Id.

On January 18, 2007, Dr. Barros noted that Plaintiff "smoked 'weed' 2 days ago" because he "was stressed [about] going to court."  Id. at 206.  She indicated that Plaintiff had taken his medication as prescribed, but due to "insufficient improvements" and "client preference," she further prescribed Remeron.  Id. at 206-08.  Dr. Barros commented that Plaintiff "[h]ears voices at times – somebody tells him to do things (rob a bank)" and that Plaintiff thinks people are out to harm him.  Id. at 206.  She once again assigned Plaintiff a GAF score of 40.  Id. at 207.  On the same day, Plaintiff met with a registered nurse whose notes reflected Plaintiff's thoughts "that he is not better, . . . he is still depressed, has mood swings, irritable, agitated, insomnia, anxious, poor impulse control and hearing voices and does not believe med helping at all."  Id. at 209.

On February 8, 2007, Dr. Barros indicated that Plaintiff had taken his medication as prescribed and that he had not engaged in substance abuse, but she noted that "2-3 weeks ago [Plaintiff] smoked some weed."  Id. at 210.  She also commented that Plaintiff "thinks people are out to harm him," he "gets mad real quick," and he "occasional[ly] hears voices [that] tell him to

rob and steal." Id. at 211. She assigned Plaintiff a GAF score of 40. Id. In a General Relief Medical Statement signed by Dr. Barros on February 8, 2007, she diagnosed Plaintiff as having Psychotic Disorder and Depressive Disorder, and she indicated that Plaintiff would be unable to work through the end of August 2007. Id. at 106, 201. Plaintiff did not meet with a nurse on February 8, 2007, but he did on February 22, 2007, at which time Plaintiff reported that was "getting easily angry" and "taking his meds as ordered." Id. at 213.

On March 8, 2007, Dr. Barros once again indicated that Plaintiff was taking his medication as prescribed and that Plaintiff had not engaged in substance abuse. Id. at 214. She also commented that Plaintiff "keep[s] waking up at night" and he has "ideas of persecution and reference" as well as "paranoia." Id. at 214-15. She assigned Plaintiff a GAF score of 44 and suggested that he continue the same medication regimen. Id. at 215. Plaintiff tested negative for all substances, reported compliance with his medication, and denied experiencing any side effects. Id. at 215, 217.

On April 2, 2007, when Plaintiff met with a nurse, he admitted that "he will forget or sometimes just not take his meds," but he said he feels calmer when taking them. Id. at 246. Plaintiff also acknowledged that he last used marijuana during the previous week, but he denied alcohol and any other illicit drug use. Id. Plaintiff said he hears occasional voices and that he has anger management problems. Id. The nurse noted that "[i]t is difficult to obtain clear info from patient. He is initially quite evasive and will also change his responses to questions asked of him." Id.

Plaintiff was incarcerated from April until July, so his next visit with Dr. Barros did not occur until July 16, 2007. Id. at 246-49. At this meeting, Dr. Barros noted that Plaintiff had not been taking his medication as prescribed, but he continued taking his medication to a certain extent while in jail, and Plaintiff said his meds were helping. Id. at 249-50. Dr. Barros assigned Plaintiff a GAF score of 55. Id. at 250. She indicated no substance use and Plaintiff tested negative for all substances. Id. at 249, 251. In his visit with a nurse, Plaintiff endorsed continued sobriety and "said he has decided to change his ways because he never wants to be locked up again." Id. at 251.

Although detailed reports are lacking for Plaintiff's subsequent visits with Dr. Barros, in a General Relief Medical Statement signed by Dr. Barros on January 15, 2008, she diagnosed Plaintiff as having Depressive Disorder and Attention Deficit Disorder, and she indicated that Plaintiff would be unable to work through the end of June 2008.  Id. at 107, 264.  Dr. Barros signed another General Relief Medical Statement on June 4, 2008, in which she diagnosed Plaintiff as having Schizoaffective Disorder, and she indicated that Plaintiff would be unable to work through the end of June 2009.  Id. at 268.

The final report in the record from Dr. Barros is a Psychiatric/Psychological Impairment Questionnaire completed on July 16, 2008.  Id. at 270-77.  In the questionnaire, Dr. Barros diagnosed Plaintiff as having Schizoaffective Disorder, ADHD, and Cannabis Dependence.  Id. at 270.  She assigned him a GAF score of 45, and she described Plaintiff's compliance to medication as "minimal to moderate," noting that he "periodically still smokes cannabis."  Id.   Dr. Barros listed Plaintiff's primary symptoms as "depression, poor concentration, periodic auditory hallucinations, ideas of reference and persecution, anxiety, anger and explosiveness," and she indicated that they are all frequent and severe.  Id. at 272.  She indicated that Plaintiff was incapable of even low work stress and added that he "does not want people to tell him what to do."  Id. at 276.  In regards to rating twenty various aspects of Plaintiff's "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interactions," and "Adaptation," Dr. Barros twice indicated that there was "No evidence of limitation," she twice indicated that Plaintiff was "Mildly limited," nine times she indicated that Plaintiff was "Markedly limited," and seven times she indicated that Plaintiff was "Not ratable on available evidence."[7]  Id. at 273-75.  Dr. Barros also remarked that Plaintiff was "most probably not" a "malingerer," that Plaintiff started hearing voices around age 18, and that Plaintiff would be absent from work "[m]ore than three times a month," on average, due to his "impairments or treatment."  Id. at 276-77.

///

///

---

[7] As the ALJ explained in his written decision, a claimant's impairments must result in marked restriction in at least two specific areas in order to satisfy the listed impairments.  AR at 15.  Dr. Barros's ratings demonstrate that Plaintiff's condition met or equaled listed impairments.  Id. at 273-75.

3. Kevin David Gregg, M.D., and Henry Amado, M.D., Board-Certified State Agency Psychiatrists[8] - April and September 2007

On April 12, 2007, Dr. K. D. Gregg reviewed Plaintiff's medical records and completed a Mental Residual Functional Capacity Assessment Evaluation of Plaintiff.  AR at 222-24.  This form, like the abovementioned questionnaire completed by Dr. Barros, required Dr. Gregg to assess Plaintiff's limitations in various work-related categories.  Id.  However, in contrast to Dr. Barros's ratings in July 2008,  Dr. Gregg indicated that Plaintiff was either "Not Significantly Limited" or only "Moderately Limited" in "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interaction," and "Adaptation."  Id. at 222-23.  As a result, Dr. Gregg affirmed the initial decision that Plaintiff "should be capable of performing non-public SRT's [simple repetitive tasks] on a sustained basis with adequate persistence and pace," and that Plaintiff "can adapt to changes in the work setting and can interact with co-workers and supervisors."  Id. at 224.  Dr. Gregg also rated Plaintiff's functional limitations as a result of his mental disorders.  Id. at 233.  That is, using the listings 12.04 (Affective Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders), and basing his medical disposition on the belief that Plaintiff suffered from a Mood Disorder, probably a Personality Disorder, and Cannabis Dependence, Dr. Gregg determined the degree of Plaintiff's functional limitations to be non-existent, mild, or moderate.  Id. at 225, 228, 230-31, 233.  Ultimately, Dr. Gregg concluded that Plaintiff "should be capable of performing non-public SRT's."  Id. at 237, 255.  On September 5, 2007, Dr. Henry Amado affirmed the "[i]initial-level determination dated 4/12/07, for unskilled/nonpublic MRFC [Mental Residual Functional Capacity]."  Id. at 255-56.

4. Catalyst, Providence Community Services, various Licensed Therapists and Social Workers - July 2007 through July 2008

Plaintiff started participating in mental health services at Catalyst on July 16, 2007.  AR at 266, 468.  During his first session, Plaintiff stated that "he really wants to get a job and that he has had a lot of jobs in the past, and that in the past year, he held 2-3 different kinds of jobs,

---

[8] A list of San Diego DDS (Disability Determination Services) physicians is included in the record.  AR at 262. This list indicates when and where the physician attended medical school, the physicians' area of practice, and whether or not the physician is Board certified.  Id.

1   until he got incarcerated for robbery." Id. at 468.  The therapist noted that Plaintiff "presented

2   with symptoms of mania" while relaying this information and that Plaintiff stated that "he is

3   currently not taking his medications." Id.  Also during this initial session, Plaintiff admitted that

4   he had a history of using marijuana, but that "he did not use it, as he could not use it, while he

5   was in jail for the past 6 months," and Plaintiff wanted "to continue to stay sober as he does not

6   want to violate his probation." Id.  Plaintiff was diagnosed with Schizoaffective Disorder and

7   Cannabis Dependence, early full remission. Id.  The report also noted Plaintiff's past GAF score

8   of 49 and current GAF score of 41. Id.

9          In the ensuing months, while receiving services from Catalyst, Plaintiff was required to

10  attend NA meetings, get drug tested, participate in substance abuse counseling, and abstain from

11  using any type of mood altering substance. Id. at 266, 466.  Plaintiff was therefore repeatedly

12  educated on how marijuana use could negatively impact his mental health, his medication

13  regimen, and his daily life. Id. at 343, 367, 369, 372, 374, 387, 391, 393, 402.  On the one hand,

14  Plaintiff's case managers and therapists frequently noted his medication compliance and sobriety

15  (id. at 266, 285, 288, 353, 371, 376, 384, 402, 407, 413, 416, 419, 430, 439, 443, 450, 458), as

16  well as his desire to stay sober (id. at 365, 458, 465, 468) and his denial of any adverse side

17  effects from his medication (id. at 389, 394, 430, 439, 463).  However, reports also indicate

18  Plaintiff's admissions of marijuana use (id. at 395, 398, 400, 441, 450, 454, 455), and Plaintiff's

19  conflicting answers regarding whether he was medication compliant (id. at 286, 292, 294, 302,

20  310, 315, 417, 434, 444) and whether he experienced side effects from his medication (id. at 444,

21  455).  Similarly, although Plaintiff experienced periods of time in which he seemed well-adjusted

22  at home and/or in group settings (id. at 411), on numerous occasions, he lost control of his

23  emotions, exhibited strange behavior, or lacked proper insight and judgment regarding his

24  behavior (id. at 266, 292, 308, 349, 364, 380-82, 401, 406, 408-09, 411, 412, 414, 415, 416, 417,

25  419, 431, 435, 445, 447).  Finally, Plaintiff frequently told his therapists that although he was

26  capable of getting a job, he did not want to do so because gaining employment would jeopardize

27  his SSI application (id. at 305, 327, 340, 342, 352, 360, 364, 373, 377, 419).

28  ///

1

### a. Daniela Tabacaru, M.D. (Psychiatrist) - March 2008

2　　On March 25, 2008, Dr. Tabacaru evaluated Plaintiff in a 45-minute face-to-face diagnostic

3　examination.[9]  AR at 355-57.  She diagnosed Plaintiff with Schizoaffective Disorder by history, and

4　Cannabis Dependence, noting that Plaintiff last used marijuana in December 2007.[10]  Id. at 355-

5　56.  Dr. Tabacaru also indicated that Plaintiff was calm, cooperative, and had fair to good insight

6　and judgment.  Id. at 356.  She assigned Plaintiff a GAF score of 65.  Id.

7

### b. Dimple Srinivasan, M.A., IMF (Therapist) - April 2008

8　　In a letter dated April 22, 2008, Plaintiff's primary therapist, Dimple Srinivasan, summarized

9　Plaintiff's treatment at Catalyst.  AR at 266.  Ms. Srinivasan explained that Plaintiff "presents with

10　paranoid, unrealistic and disorganized thought process, symptoms of Psychosis as well as mood

11　instability and has been currently diagnosed with Schizoaffective disorder."  Id.  She also stated

12　that Plaintiff "has been regularly attending his appointments at Catalyst; has been attending

13　groups at Catalyst and NA meetings everyday."  Id.  Finally, she commented that Plaintiff "has

14　been taking his medications regularly and continues to maintain sobriety."[11]  Id.

15  **C.  Social Security Administration Hearing**

16　　On August 11, 2008, Plaintiff, represented by counsel, appeared at his hearing before the

17　ALJ.  AR at 23.  During the hearing, the ALJ questioned Plaintiff regarding his work experience,

18　illegal drug use, criminal history, and medical history.  Id. at 26-41.  Plaintiff testified that he

19　previously gained employment through a temporary agency and worked as a rental car driver and

20　a hospital housekeeper.  Id. at 26-28.  When asked if he was "still smoking pot," Plaintiff

21　responded, "No sir because I'm on probation.  I'll go to jail if I do, so I don't."  Id. at 28.  Plaintiff

22

23　　[9] Dr. Tabacaru indicated that "[n]o old records [were] available," and the diagnostic examination was

24　therefore based on her face-to-face "[p]atient interview" with Plaintiff.  AR at 356.

　　[10] However, Plaintiff admitted having a dirty test in February 2008.  AR at 28.

25

26　　[11] In his Motion for Summary Judgment, Plaintiff contends that he was "re-evaluated" by Ms. Srinivasan on

27　June 25, 2008, and he cites page 292 of the Administrative Record for support.  ECF No. 10 at 10.  Although the
record does contain reports regarding Plaintiff's visit to Catalyst on this date (AR at 293-94), the report included at
page 292 of the record does not appear to be regarding Plaintiff.  As an initial matter, a client name other than
Plaintiff's is written in the lower right-hand corner of the report.  AR at 292.  Moreover, Ms. Srinivasan's notes indicate

28　that the report was an "intake" report and a session to "initiate" assessment.  Id.  Finally, the report states that the
client "takes no medications at present and that he stopped them 5 months ago."  Id.

testified that he gets drug tested two times a month and that he had a "dirty test" in February 2008, a violation for which he served two weeks in jail. Id. at 28-29. Additionally, Plaintiff testified that he was in jail from about March 2007 to July 2007 for "a minor robbery." Id. at 29.

The ALJ then inquired whether Plaintiff had any physical or emotional problems that would keep him from working. Id. at 30. Plaintiff testified that he has "bad asthma," which "prevents [him] from working under air conditioning." Id. Regarding emotional problems, Plaintiff testified that he is "not [] able to get a job and stay on the job," and that "[i]t's hard to function in life period." Id. Plaintiff testified that he started receiving treatment from Dr. Barros in November 2006 and that he was currently taking the medications Seroquel and Strattera so "[he] can be calm." Id. at 31, 35. Plaintiff testified that he had been on more medication, but "[he] couldn't move [he] couldn't do anything, you know." Id. at 31. Plaintiff explained that the side effects from his current medication made him hungry, tired, and irritated, such that  he only really wanted to be around family. Id. When asked about the symptoms and conditions of his illness, Plaintiff stated that "[i]t stops [him] from functioning." Id. at 35. He further explained, "You might tell me one thing, I forgot what you said you know and . . . I've got things I have to do and I can't do them." Id. at 36.

When the ALJ asked Plaintiff why he cannot work, Plaintiff answered, "I can't even sign an application." Id. at 37. Plaintiff elaborated, "I feel if I sign the application, they don't call me back it's like I wasted my time. I don't like to feel like that." Id. When questioned further by his attorney, Plaintiff testified that he has a difficult time understanding people when they explain things to him and he sometimes has problems focusing on tasks. Id. at 38-39. Plaintiff's attorney also asked about his tendency to become irritated or angry, to which Plaintiff replied, "It happens a lot." Id. Plaintiff testified that he feels as though he is "always in a stressful situation" and he has the feeling that people are talking about him and being critical of him. Id. at 40. Plaintiff further explained, "It's hard to deal with. It kind of like messed up my mind." Id. When asked if he had difficulties taking orders from superiors when he was working Plaintiff said yes, and when asked if he ever finds it difficult to go out in public, Plaintiff said yes. Id. at 40-41.

Plaintiff testified that he lives with his mother and he has a driver's license, but he takes

the bus to his programs at Catalyst Providence Community Services, which he attends three times a week.  Id. at 31-32.  When he is not at Catalyst, Plaintiff testified that he sleeps and spends time with his family and friends, but lately he has been spending a lot of time in his mother's home because "[he] found out that that's better."  Id. at 33, 36, 41.  Plaintiff also stated that he helps his mother with chores around the house, including vacuuming and picking up heavy things.  Id. at 35.

Dr. Alan E. Cummings, an impartial vocational expert ("VE"), testified at Plaintiff's hearing.  Id. at 12, 41-44.  The ALJ presented the VE with several hypothetical questions concerning potential employment for someone of Plaintiff's age, education, work history, and medical condition.  Id.  Specifically, the ALJ first described a hypothetical individual diagnosed with the listings 12.04 (Affective Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders), capable of non-public, simple repetitive tasks.  Id. at 41.  The VE testified that someone with these limitations could perform 1,500 of the 2,500 medium job titles in the grid, such as packager, assembler, and cleaner.  Id. at 41-42.  According to the VE, 1.3 million such positions were available nationally, and 17,700 were available in the region.  Id. at 42-43.  The second hypothetical was premised upon "continued substance abuse, unable to maintain a work schedule"; the third hypothetical was based upon general relief forms indicating an inability to work as well as a diagnosis of "depressive disorder, attention deficit disorder, needs continued rehabilitation"; the fourth hypothetical was based upon a diagnosis of schizoaffective disorder, ADHD, cannabis dependence, "GAF of 45, compliance to meds minimum to moderate, periodically still smokes cannabis, can't maintain work schedule, no attention and concentration for extended periods, incapable of [] low stress, does not want people to tell him what to do"; and the fifth hypothetical was "the claimant's statement of unable to sustain work."  Id. at 43-44.  For each of these four hypotheticals, the VE testified that there would be "no full-time work" for that individual.  Id. at 43-44.

On August 21, 2008, the ALJ issued a written opinion concluding that Plaintiff "is under a disability, but that a substance use disorder is a contributing factor material to the determination of disability."  Id. at 13.  Accordingly, the ALJ determined that Plaintiff had not been disabled at

1  any time from the date Plaintiff filed his application through the date the ALJ issued his

2  decision.  Id.

3  **D. New Evidence and Appeals Council Review**

4      On September 4, 2008, Plaintiff sought review of the ALJ's decision and submitted the

5  following additional evidence, which the Appeals Council made part of the record.  AR at 4, 6.

6      1. Supplemental Brief - October 9, 2008 (Exhibit 15E)

7      On October 9, 2008, Plaintiff submitted a letter brief to the Appeals Council in relation to

8  his appeal of the ALJ's decision.  AR at 187.  Attached to the brief was a statement from Michael

9  Villaroel, D.O., dated August 30, 2008, indicating that Dr. Villaroel is "the attending physician for

10  [Plaintiff] regarding the therapeutic value of medical marijuana for [Plaintiff]," and "the medical

11  use of marijuana is appropriate for [Plaintiff's] serious medical condition."  Id. at 190.  Plaintiff's

12  attorney opined that because "[m]arijuana use has been specifically recommended by [Plaintiff's]

13  medical doctor as treatment for [Plaintiff's] severe psychiatric conditions[,] its use clearly should

14  not be used against him when determining his disability."  Id. at 187.

15      Plaintiff also asserted that the ALJ "erred by failing to follow the treating physician rule."

16  Id. at 188.  More specifically, Plaintiff argued that in rejecting the opinion of treating psychiatrist

17  Dr. Barros, the ALJ failed to abide by 20 C.F.R. § 416.927(d)(2), which states in pertinent part:

18
19          If we find that a treating source's opinion on the issue(s) of the nature and
            severity of your impairment(s) is well-supported by medically acceptable clinical
20          and laboratory diagnostic techniques and is not inconsistent with the other
            substantial evidence in your case record, we will give it controlling weight.

21  20 C.F.R. § 416.927(d)(2).  Plaintiff contended that the ALJ's basis for rejecting Dr. Barros's

22  opinion—the fact that Plaintiff was using marijuana—was counterintuitive because logic dictates

23  that Dr. Barros's opinion "reflected the limitations imposed by [Plaintiff's] psychiatric disorder that

24  would not be negated by his drug use."  AR at 188.  Moreover, Plaintiff argued that the ALJ's

25  rejection of Dr. Barros's opinion was improper because "it is impossible to accurately determine

26  the extent of the doctor's opinion being independent of drug use without confirmation by Dr.

27  Barros herself . . . [and] it was the ALJ's duty to recontact Dr. Barros as there was a supposed

28  ambiguity as to what her report was addressing."  Id.; see also 20 C.F.R. § 416.912(e)(1).

Finally, Plaintiff argued that the ALJ "erred by failing to conduct a proper credibility analysis." AR at 189. Plaintiff alleged that the ALJ "simply reproduced a boiler plate paragraph" and "fail[ed] to give any reasoning" for his determination that Plaintiff's testimony lacked credibility. Id. Plaintiff asserted that the ALJ's credibility finding was error because the ALJ offered only an inadequate conclusory statement in support of his finding. Id. (citing SSR 96-7p).

2. Medical Evidence from County of San Diego Health and Human Services Agency - November 8, 2006 (Exhibit 20F)

The Appeals Council described these November 8, 2006 medical reports as "additional evidence." AR at 4. However, the reports included in Exhibit 20F are identical to the reports included in Exhibit 2F, which was part of the record prior to the ALJ's decision. Id. 196-200, 469-73. This evidence, from Dr. Kang and Ms. Lewis, is summarized above. See supra pp. 3-4.

3. Medical Evidence from Sharp Grossmont Hospital - May 21, 2009 to May 26, 2009, (Exhibit 21F)

On May 21, 2009, Plaintiff, accompanied by his mother and a close friend, went to the Emergency Department of Sharp Grossmont Hospital, where his primary diagnosis was "Psychosis - unspecified" and his secondary diagnosis was "Hallucinations." AR at 480, 484. Plaintiff indicated that for the past two weeks, he had been hearing voices telling him to hurt himself and others, and he also complained of his legs "shaking." Id. at 480. Plaintiff stated that he felt like he was choking when he was lying down, and he had also recently told his mother that he saw demons enter their apartment and put poison in their lemonade. Id. at 483, 485. Plaintiff stated he had been taking Seroquel, but he denied the use of tobacco, alcohol, and drugs, and he tested negative for all substances, including THC. Id. at 480-81, 488. While at the hospital, Plaintiff was placed in a locked unit where he was heavily monitored and medicated as necessary. Id. at 481-87, 490-92. Although he was initially placed on a 14-day hold, Plaintiff's condition improved such that he was discharged on May 26, 2009. Id. at 490-94.

4. Medical Evidence from Edward G. Arevalo, M.D. (Psychiatrist) - September 2008 to June 2009 (Exhibit 22F)

The first report from Dr. Arevalo, dated September 11, 2008, indicates that Plaintiff was

not taking any medications at that time except for "medical marijuana." AR at 496.  Dr. Arevalo noted that because Plaintiff "chose to cont[inue] on medical marijuana," no psychotropic medication would be prescribed.  Id.  Plaintiff denied emotional distress and Dr. Arevalo noted that Plaintiff had fair affect and a good mood, but Plaintiff had visual hallucinations about two weeks ago.  Id.  Plaintiff stated that his marijuana use helps with his anxiety and makes him feel calmer.  Id.  However, at Plaintiff's next appointment on October 28, 2008, Plaintiff had "stopped cannabis" and was back on Strattera, Seroquel, Vistaril, and Remeron.  Id. at 497.  Dr. Arevalo rated Plaintiff's anxiety and mood lability as "medium," but Plaintiff's mental status exam indicated auditory and visual hallucinations, as well as agitation and irritability.  Id. at 497-98.  Plaintiff was directed to "maintain sobriety."  Id. at 498.  On November 10, 2008, Dr. Arevalo rated Plaintiff's symptoms of Depression, Psychosis, and Insomnia higher than in previous visits, and he also indicated a side effect of sluggishness.  Id. at 499.  Dr. Arevalo "encouraged better Seroquel compliance."  Id. at 500.  On November 20, 2008, Plaintiff denied cannabis use, and Dr. Arevalo again noted that Plaintiff was not taking Seroquel as prescribed, but he indicated that Plaintiff was regularly taking his other medications and still experiencing  "some sluggishness" as a side effect.  Id. at 501.  Dr. Arevalo rated Plaintiff's symptoms lower than previous visits and Plaintiff's mental status exam was his most "normal" one to date.  Id. at 501-02.  Accordingly, on December 4, 2008, Dr. Arevalo completed a doctor's certificate regarding Plaintiff's claim for disability insurance benefits and indicated his belief that Plaintiff could "return to his/her customary work" by April 20, 2009.  Id. at 503.  However, Dr. Arevalo also indicated Plaintiff's primary diagnosis of schizoaffective disorder and he noted that Plaintiff "has had symptoms of hallucination, anxiety, inattention, and mood swings."  Id.

In his reports dated December 11, 2008, January 22, 2009, and February 19, 2009, Dr. Arevalo noted that Plaintiff's substance use consisted of alcohol "on occasion," but Plaintiff denied using marijuana in the past several months.  AR at 504, 507.  Dr. Arevalo rated Plaintiff's symptoms as low and his mental status exams were overwhelmingly positive.  AR at 504-05, 507-08.  In January, Plaintiff reported that his current dose of Seroquel was sufficient in controlling his moods and current psychoses.  Id. at 508.  In February, when Plaintiff ran out of Seroquel

1  prior to his appointment with Dr. Arevalo, Dr. Arevalo indicated Plaintiff complained of insomnia

2  and Dr. Arevalo noted a slight increase in Plaintiff's symptoms.  Id. at 509.  Plaintiff tried Vistaril

3  but complained of headaches.  Id.  On April 24, 2009, when Plaintiff was back on Seroquel, he

4  reported that his psychosis was in remission.  Id. at 511-12.  However, in his May 27, 2009 report,

5  Dr. Arevalo noted that Plaintiff had recently been hospitalized for being disorganized and

6  responding to auditory hallucinations, and Dr. Arevalo indicated an increase in Plaintiff's psychosis

7  positive symptoms.  Id. at 516.  Moreover, on June 4, 2009, when Dr. Arevalo filled out a medical

8  report for Plaintiff's General Relief application, he noted that Plaintiff's disability is permanent, and

9  although Plaintiff could care for himself and he was cooperating with prescribed treatment, he

10  was incapable of performing any work.  Id. at 513.

11       5. Medical Evidence from Sharp Grossmont Hospital - May 21, 2009 (Exhibit 23F)

12       The last piece of additional evidence provided to the Appeals Council is the "Involuntary

13  Patient Advisement" read and given to Plaintiff when he was admitted to Sharp Grossmont

14  Hospital on May 21, 2009.  AR at 519.  The "Psych. Liaison" who completed the form noted that

15  Plaintiff was "placed in this psychiatric facility because it [was] the opinion of the professional

16  staff, that as a result of a mental disorder, [Plaintiff] [was] Gravely Disabled," meaning "unable

17  to provide for [his] own food clothing or shelter."  Id.  The one page document also indicates that

18  at the time of his admission, Plaintiff was "disorganized and hearing voices."  Id.

19       Despite this additional evidence, the Appeals Council "found that the [ALJ's] decision is

20  supported by substantial evidence and that [Plaintiff's new] information does not provide a basis

21  for changing the [ALJ's] decision."  AR at 1-2.  On May 11, 2010, the Appeals Council denied

22  Plaintiff's request for review and finalized the ALJ's decision.  Id. at 1-4.

23                              **STANDARD OF REVIEW**

24       Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial

25  review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is

26  limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence

27  and contains no legal error.  Id.; Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193

28  (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla, but may be less than a preponder-ance." Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  "In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted).  Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision.  Batson, 350 F.3d at 1193.  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  Lewis, 236 F.3d at 509.

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  See Batson, 359 F.3d at 1193.  Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to the Social Security Administration for further proceedings.  Id.

## DISCUSSION

Pursuant to Social Security Regulations, the ALJ followed a five-step sequential evaluation process for determining whether Plaintiff was disabled.  AR at 13-22; see also 20 C.F.R. § 416.920(a) (describing five-step assessment).  At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability.  AR at 15; see also 20 C.F.R. § 416.920(a)(I).  At the second step, the ALJ determined that Plaintiff had the following "severe combination of impairments: schizoaffective disorder; attention defi-cit/hyperactivity disorder (ADHD); and a substance abuse disorder." AR at 15; see also 20 C.F.R. § 416.920(a)(ii).  At the third step, the ALJ found that Plaintiff's impairments, including the substance abuse disorder, met listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders) and satisfied the requisite duration requirement.  AR at 15, 225; see also 20 C.F.R.

§ 416.920(a)(iii).   The ALJ noted that Plaintiff had marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and moderate restrictions in engaging in daily living activities.  AR at 15.  Thus, the ALJ determined that Plaintiff was disabled.  Id.; see also 20 C.F.R. § 416.920(a)(iii).  However, as ALJ Steinman explained in his written decision, this is not the end of the inquiry:

> If it is found that the claimant is disabled and there is medical evidence of a substance use disorder, the [ALJ] must determine if the substance use disorder is a contributing factor material to the determination of disability.  In making this determination, the [ALJ] must evaluate the extent to which the claimant's mental and physical limitations would remain if the claimant stopped the substance use. If the remaining limitations would not be disabling, the substance use disorder is a contributing factor material to the determination of disability.  If so, the claimant is not disabled.

AR at 14 (citation omitted); see also 20 C.F.R. § 416.935.

Accordingly, the ALJ re-evaluated Plaintiff's impairments and capabilities, excluding the substance abuse disorder.  First, the ALJ opined that if Plaintiff "stopped [his] substance use, the remaining limitations would cause more than a minimal impact on [his] ability to perform basic work activities; therefore, [Plaintiff] would continue to have a severe impairment or combination of impairments."  AR at 15.  However, the ALJ then determined that the remaining impairments would not "meet[] or medically equal[] any of the [listed] impairments."  Id. at 16; see also 20 C.F.R. §416.920(d).  The ALJ concluded that "[i]f [Plaintiff] stopped the substance use, [he] would have the residual functional capacity to perform medium work . . . except he would be limited to simple repetitive tasks in a non-public work environment."  Id. at 16.  Based on this determination, the ALJ proceeded to the fourth and fifth steps.

At the fourth step, the ALJ found that Plaintiff would be unable to perform past relevant work because Plaintiff did not have any such work.  Id. at 20.  At the fifth step, the ALJ relied on the VE's testimony that there were a significant number of jobs in the national economy that Plaintiff could perform given Plaintiff's age, education, work experience, and residual functional capacity (as determined by the ALJ assuming Plaintiff stopped his illegal drug use).  Id. at 21. Accordingly, the ALJ found that Plaintiff was not disabled within the Social Security framework. Id. at 21-22.

1    Plaintiff asserts that the ALJ's decision "lacks the support of substantial evidence and is

2    based on legal error." Pl.'s Mot. at 1. Specifically, Plaintiff argues that the ALJ improperly

3    evaluated the medical evidence and erroneously determined that Plaintiff was not credible. Id.

4    at 11-17. Plaintiff therefore seeks reversal of the ALJ's decision and an award of benefits, or, in

5    the alternative, reversal and remand for a new hearing. Id. at 1, 17. In contrast, Defendant

6    contends that the ALJ properly evaluated the medical evidence of record and provided legally

7    sufficient reasons for discounting Plaintiff's credibility. Def.'s Mot. & Opp'n at 11-17.

8    **A. The ALJ's Evaluation of the Medical Evidence**

9    Plaintiff challenges the ALJ's determination that Plaintiff's substance use disorder is a

10   contributing factor material to the determination of disability. Pl.'s Mot. at 11-14. Plaintiff argues

11   that the ALJ erroneously rejected the opinion of the treating physician, Dr. Barros, and did not

12   give proper weight to the findings of other examining physicians and therapists. Pl.'s Mot. at 11-

13   14. Plaintiff explains that Dr. Barros determined that Plaintiff was unable to work due to his

14   medical conditions but the ALJ rejected this opinion based solely on the ALJ's determination that

15   Plaintiff "continued to use marijuana despite the fact that he was told that it 'would cause his

16   medications to be ineffective.'" Id. at 12 (citing AR at 17). Plaintiff argues that this conclusion

17   constitutes legal error. Id. at 14. Defendant, on the other hand, asserts that the ALJ "properly

18   rejected [Dr. Barros's] opinion" because "Dr. Barros did not consider Plaintiff's functionality when

19   sober," and her opinion therefore "had no evidentiary value on the issue of whether Plaintiff

20   would be disabled if he stopped using marijuana."[12] Def.'s Mot. & Opp'n at 12. Defendant further

21   argues that the ALJ properly considered and utilized the findings of the other physicians. Id. at

22   12-14.

23   In determining whether a claimant's drug addiction is a contributing factor material to the

24   determination of disability, the "key factor" an ALJ must examine is whether the claimant would

25   still be disabled if he stopped using illegal drugs. 20 C.F.R. § 416.935(b)(1). In making this

26   determination, an ALJ must evaluate which of the claimant's limitations would remain if he

27

28        [12] Notably, Defendant does not indicate what physician, if any, "consider[ed] Plaintiff's functionality when
     sober." Def.'s Mot. & Opp'n at 12.

1  stopped using illegal drugs, and whether any or all of those remaining limitations would be

2  disabling.  20 C.F.R. § 416.935(b)(2).  If the ALJ determines that the claimant's remaining

3  limitations would not be disabling, the ALJ "will find that [the claimant's] drug addiction . . . is a

4  contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b)(2)(I).  The

5  burden of proving that drug addiction was not a contributing factor material to the disability

6  determination falls on the claimant, <u>Parra v. Astrue</u>, 481 F.3d 742, 748 (9th Cir. 2007), but "the

7  ALJ retains the responsibility of developing a full and fair record in the non-adversarial

8  administrative proceeding." <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 693 (8th Cir. 2003) (citation

9  omitted).  Accordingly, the regulations dictate that:

10     When the evidence [an ALJ receive[s] from [a claimant's] treating physician or
        psychologist or other medical source is inadequate for [the ALJ] to determine
11     whether [that claimant is] disabled, [an ALJ] will need additional information to
        reach a determination or a decision. . . . [An ALJ] will seek additional evidence or
12     clarification from [a claimant's] medical source when the report from [that
        claimant's] medical source contains a conflict or ambiguity that must be resolved,
13     the report does not contain all the necessary information, or does not appear to be
        based on medically acceptable clinical and laboratory diagnostic techniques.

14

15  20 C.F.R. § 416.912(e)-(e)(1).

16        In certain cases, a claimant's substance use and impairment may be closely related.  <u>See,</u>

17  <u>e.g.</u>, <u>Salazar v. Barnhart</u>, 468 F.3d 615, 621-22 (10th Cir. 2006) (claimant's mental illness may

18  account for that claimant's substance abuse); <u>Kangail v. Barnhart</u>, 454 F.3d 627, 629 (7th Cir.

19  2006) (claimant's mental illness can precipitate substance abuse as a means by which the

20  claimant tries to self-medicate).  Notably, the mere fact that substance abuse aggravates rather

21  than medicates mental illness does not establish that the mental illness itself is not disabling.  <u>See</u>

22  <u>Kangail</u>, 454 F.3d at 629.  Due to the difficulty inherent in separating the effect of mental illness

23  on a claimant's functioning from the effect of substance use on that same claimant's functioning,

24  courts have held that if the effect of a claimant's mental illness cannot be separated from the

25  effects of substance abuse, the substance abuse is not a contributing factor material to the

26  disability determination.  <u>See, e.g.</u>, <u>Kluesner v. Astrue</u>, 607 F.3d 533, 537 (8th Cir. 2010) ("In

27  other words, on the materiality of his marijuana use, a tie would go to [claimant]."); <u>Salazar</u>, 468

28  F.3d at 622-24.  If, however, the claimant's physician concludes that the claimant's mental illness

is secondary to the primary problem of substance abuse, the record supports a finding that the claimant is not disabled.  See, e.g., Vester v. Barnhart, 416 F.3d 886, 891 (8th Cir. 2005) ("After considering all of the evidence under the substantial evidence standard, we are satisfied that the ALJ [] untangled [claimant's] history of alcoholism and mental illness with sufficient clarity and detail to support the finding that she is not disabled apart from her alcoholism.").

The ALJ stated, in support of his conclusion that Plaintiff would not be disabled if he stopped using marijuana, that "[n]o physician has opined that [Plaintiff's] condition meets or equals any listing, and the state agency medical consultants have opined that it does not."  Id. at 16.  Although this statement is ambiguous, the Court assumes from the placement of the statement in the report that the ALJ meant that no physician has opined that Plaintiff's condition would meet or equal any disability listing if Plaintiff discontinued his use of marijuana.  While this statement technically is true, it also is misleading.  The record reveals that no physician opined on what Plaintiff's limitations or capabilities would be if he stopped using illegal drugs.[13]  Similarly, while the "state agency medical consultants" did opine that Plaintiff was not disabled, they did so without considering Plaintiff's theoretical capabilities if he were to stop using illegal drugs.  Drs. Gregg and Amado concluded that Plaintiff was capable of "performing non-public SRTs" even with his illegal drug use.[14]  See supra p. 8.  The ALJ explicitly rejected this conclusion when he determined that Plaintiff was disabled at Step Three when the illegal drug use was included.  See supra pp. 17-18.  As such, the state agency medical consultants' opinions do not support the ALJ's stated conclusion.  As a result, the only "evidence" supporting the ALJ's conclusion is a statement made to Plaintiff by a social worker that his continued use of marijuana would cause his

[13] Dr. Kang, the Staff Psychiatrist at San Diego County Psychiatric Hospital who assessed Plaintiff in November 2006, stated in his report: "Probable significant attention deficit hyperactivity disorder, problems associated with intermittently explosive episodes while abusing cannabis, which will further amplify his attention deficit hyperactivity disorder symptoms."  AR at 198.  Although Dr. Kang seems to indicate Plaintiff's cannabis use will exacerbate his ADHD symptoms, Dr. Kang does not specifically opine on whether Plaintiff's "significant attention deficit hyperactivity disorder" would subside absent Plaintiff's cannabis use.  Regardless, the ALJ did not reference this part of Dr. Kang's report in his written decision, and as such, the Court cannot consider this information in reviewing the ALJ's materiality determination.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts.").

[14] If the ALJ instead meant that no physician opined that Plaintiff's condition would meet or equal any listing even if Plaintiff continued his use of marijuana, the record belies this conclusion.  Plaintiff's treating physician, Dr. Barros, knew about Plaintiff's drug use and opined that Plaintiff's condition was disabling.  AR at 273.

1   medications to be ineffective, and selective evidence that Plaintiff's level of functioning was higher

2   on some days when Plaintiff apparently was not using illegal drugs. Id. at 16-20. The Court finds

3   this evidence insufficient to support the ALJ's conclusion.

4       The Ninth Circuit has stressed that courts must not "fail[] to distinguish between substance

5   abuse contributing to the disability and *the disability remaining after the claimant stopped using*

6   *drugs or alcohol*." Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir. 1998). That is, "[j]ust

7   because substance abuse contributes to a disability does not mean that when the substance

8   abuse ends, the disability will too." Id. When a claimant is actively abusing drugs or alcohol,

9   determining which limitations would remain when the effects of substance abuse are absent is

10  necessarily hypothetical; however, the ALJ must still develop a full and fair record and support

11  his conclusion with substantial evidence. See, e.g., Brueggemann, 348 F.3d at 695; Estes v.

12  Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) ("The ALJ and the district court relied on extensive

13  medical evidence from treating and consulting physicians, psychologists and psychiatrists who all

14  noted in some fashion or another the contribution of [claimant's] severe alcohol abuse.").

15      Here, the ALJ did not develop a full and fair record regarding which limitations would

16  remain if Plaintiff stopped using illegal drugs. Significantly, none of Plaintiff's treating physicians

17  opined on Plaintiff's hypothetical capabilities if he were not using drugs or on the effect that

18  Plaintiff's illegal drug use has on his capabilities or limitations. See, e.g., Brown v. Apfel, 192 F.3d

19  492, 499 (5th Cir. 1999) ("[N]owhere in these records do any of [claimant's] doctors express an

20  opinion as to what [claimant's] condition would be if she ceased abusing drugs or alcohol. . . .

21  Quite simply, not a shred of evidence in the record casts any light on whether [claimant's]

22  disabling depression would subside if she stopped consuming alcohol and cocaine."). Similarly,

23  the consulting physicians do not separate the limitations caused by Plaintiff's drug use from the

24  limitations caused by Plaintiff's other medical issues. This lack of evidence stands in sharp

25  contrast to the evidence presented in cases approved by circuit courts. See, e.g., Kluesner, 607

26  F.3d at 535-36 (holding that substantial evidence supported substance use materiality finding

27  because licensed mental health counselor and treating physician specifically recommended that

28  claimant stop using marijuana, treating physician opined that claimant's cannabis use aggravated

his schizophrenia, and another reviewing doctor explicitly noted that claimant's "use of marijuana contributes materially to his dysfunction . . . ."); <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1281 (11th Cir. 2001) (finding sufficient evidence in the record to support the ALJ's determination that claimant's alcoholism was material contributing factor to his disability because medical experts noted that claimant appeared to be "entirely normal" when sober, did not have chronic impairments that would remain if he quit drinking, and was capable of handling his own financial affairs). Rather, the instant case is similar to cases in which courts have found a lack of substantial evidence to support an ALJ's finding that drug or alcohol use is a contributing factor material to disability. <u>See, e.g.</u>, <u>Salazar</u>, 468 F.3d at 622-26 (holding ALJ's determination that claimant's drug and alcohol addiction was contributing factor material to her mental-impairment disability was not support by substantial evidence where physicians cited by government never assessed whether claimant's mental disorders were disabling in absence of her addictions); <u>McGoffin v. Barnhart</u>, 288 F.3d 1248, 1252-53 (10th Cir. 2002) (holding non-treating physician's assessment that claimant's mental disorders were not disabling absent her substance abuse did not constitute substantial evidence because physician examined claimant only once, over a year prior to administrative hearing, and did not express opinion on nature of claimant's cognitive abilities were she to be in an independent work environment).

Lacking a physician's opinion on which limitations would remain if Plaintiff stopped using illegal drugs, the ALJ relies on other "evidence" in the record. In this regard, the ALJ repeatedly highlights the fact that Plaintiff was told that his continued use of marijuana "would cause his medications to be ineffective." AR at 19 ("While [Plaintiff] appeared to have increased symptoms, when he was seen by Dr. Barros, on January 18, 2007, . . . [t]his is consistent with the [Plaintiff] having been told that using street drugs would cause his prescribed medications to be ineffective."). While such a statement—if made in a report by a licensed physician—could support the ALJ's decision, there is no evidence that Dr. Barros or any of Plaintiff's consulting physicians believed such a statement to be true or made such a statement to Plaintiff. <u>See</u> <u>Noah v. Heckler</u>, 637 F. Supp. 19, 21 (N.D. Cal. 1985) (citation omitted) ("One written medical report from a licensed physician may be substantial evidence, and it does not matter that the doctor producing

the report was not the claimant's regular physician."). However, the isolated statement upon which the ALJ relies appears to have been made just once by Beatrice Lewis, a Senior Psychiatric Social Worker at San Diego Psychiatric Hospital, who saw Plaintiff only once in November 2006 for a total of thirty minutes for a psychiatric assessment. AR at 199-200.[15] Although he relies heavily on Ms. Lewis's statement in his written opinion, the ALJ fails to explain how Ms. Lewis's generic references to "street drugs" and "prescribed medications" constitutes substantial evidence that Plaintiff's marijuana use was a contributing factor material to his disability. In fact, when Ms. Lewis saw Plaintiff, she did not know what medication(s) he would subsequently be prescribed, so she could not accurately opine on any potential interplay between Plaintiff's marijuana use, Plaintiff's medication(s), and Plaintiff's symptoms. Id. at 199 ("Today [Plaintiff] is being referred to the on-duty psychiatrist to evaluate his medications and hopefully start him on an antipsychotic in addition to the mood stabilizer."). Notably, the report authored by Staff Psychiatrist Dr. Kang lacks any statement similar to the warning issued by Ms. Lewis in her report. Given the ambiguity of Ms. Lewis's remark, and the fact that it is not corroborated elsewhere in the record, the Court finds that this statement is insufficient to support the ALJ's determination regarding Plaintiff's capabilities if he were to stop using illegal drugs. See Salazar, 468 F.3d at 622-26; McGoffin v. Barnhart, 288 F.3d at 1252-53.

The ALJ also relied on his analysis of Plaintiff's reported behavior, GAF scores, and illegal drug use to conclude that Plaintiff's functioning was at a higher level when he was not using illegal drugs. AR at 16-20. While such evidence can be considered, in this case the ALJ's conclusion is speculative and not supported by the requisite substantial evidence. See, e.g., Reddick, 157 F.3d 715 at 720 ("In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both

---

[15] According to Ms. Lewis's report, Plaintiff's aunt brought him to San Diego Psychiatric Hospital because Plaintiff was "experiencing extreme  tactile hallucinations along with visual hallucinations," he was "easily irritated," and "sometimes stay[ed] awake up to three or four days." Id. at 199.  Plaintiff had recently been prescribed Depakene, which he said did not alleviate his symptoms; Plaintiff instead explained, "'I feel the meds are shutting me down, I experience[] voices, I feel unable to cope with even simple things by myself.'" Id. Ms. Lewis noted that Plaintiff tested positive for marijuana, admitted past cocaine use, and denied any other drug use. Id. Ms. Lewis further stated, "[Plaintiff] minimizes the cocaine.  It is unclear if he did try other drugs as he is very defensive about his past drug use." Id. Ms. Lewis then concluded her report with the statement, "It is impressed upon [Plaintiff] that street drugs will cause his prescribed medications to be ineffective." Id. at 200.

the evidence that supports and the evidence that detracts from the [ALJ's] conclusion."). For example, while Dr. Barros treated Plaintiff both when he was and was not using illegal drugs, she did not specifically note that Plaintiff's limitations were less significant when he was not using illegal drugs, nor did she comment on which limitations were the result of the illegal drug use.[16] In addition, even when Plaintiff was not using drugs (according either to his drug tests or his self-reporting), Dr. Barros noted significant limitations.[17] AR at 210-15. Similarly, the ALJ did not address whether Plaintiff was on a different medication regimen when his level of functioning increased. See, e.g., AR at 216, 251 (Plaintiff's medicine changed when he was incarcerated). Moreover, neither the ALJ nor any physician considered whether other factors (such as unrelated environmental, personal, interpersonal, etc. issues) may have caused the change in Plaintiff's functionality. See Brown, 192 F.3d at 499 ("Though the record suggests that [Plaintiff's] abuse of narcotics both exacerbated and was itself fueled by her depression, that fact is not sufficient to imply the inverse: i.e., that cessation of narcotic and alcohol usage would abate the depression. The record simply contains too may other possible reasons for [Plaintiff's] depression."). Finally, the evidence establishing Plaintiff's drug use—like that establishing his medication compliance—is somewhat inconsistent and potentially unreliable because it is based, at least in part, on his self-

---

[16] Defendant argues that Dr. Barros assigned Plaintiff a significantly higher GAF score after Plaintiff's incarceration, which therefore "supported the ALJ's finding" regarding the materiality of Plaintiff's substance use. Def.'s Mot. & Opp'n at 12. Although Plaintiff's lack of marijuana during his incarceration perhaps correlated to a decrease in his symptoms in July 2007, nothing in the record indicates that abstaining from marijuana is what caused that decrease in Plaintiff's symptoms. That is, the actual effects of Plaintiff's substance use were never catalogued by Dr. Barros or any of his treatment providers, no physician ever delineated which of Plaintiff's symptoms were or were not linked to his substance use, and no medical consultant ever opined that Plaintiff's marijuana use was his primary problem. See Drapeau v. Massanari, 255 F.3d 1211, 1215 (10th Cir. 2001) ("[N]one of the physicians who examined or evaluated [the claimant] addressed whether her alcohol abuse was a contributing factor in any of her claimed disabilities. Thus, there is no evidence in the record to support the ALJ's finding that [the claimant's] alcohol abuse was a 'material factor' in her disabilities. Accordingly, . . . [the ALJ's] conclusion was not supported by substantial evidence.").

[17] Glaringly absent from the ALJ's summary of the medical evidence of record are any references to Dr. Barros's assessment of Plaintiff in February and March of 2007. Notably, during this time period, Plaintiff was taking his medication and largely if not wholly abstaining from marijuana, yet experiencing heightened symptoms. AR at 210-15. On February 8, 2007, Dr. Barros commented that Plaintiff "thinks people are out to harm him," he "gets mad real quick," and he "occasional[ly] hears voices [that] tell him to rob and steal." Id. at 211. She assigned Plaintiff a GAF score of 40. Id. On March 8, 2007, Dr. Barros commented that Plaintiff keeps waking up at night and he has ideas of reference and paranoia. Id. at 214-15. She assigned Plaintiff a GAF score of 44. Id. at 215. Although an ALJ is empowered to make credibility findings and weigh conflicting evidence, "he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citations omitted).

reporting.  See, e.g., AR at 205, 210, 217, 249, 251, 270.

Rather than citing substantial medical evidence with clarity and detail to support his materiality finding, the ALJ seemingly "succumb[ed] to the temptation to play doctor and make [his] own independent medical findings." Rohan v. Chater, 98 F.3d 966, 968 (7th Cir. 1996); see also Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."). However, mere speculation cannot supplant medical evidence, and here, the medical reports simply do not address whether Plaintiff would remain disabled if he stopped using marijuana. See Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001) ("[T]he absence of an opinion does not constitute substantial evidence supporting the ALJ's findings."). Accordingly, the Court finds that the ALJ's determination that Plaintiff's marijuana use was a contributing factor material to his disability lacks the requisite support of substantial evidence. See Tommasetti, 533 F.3d at 1039.

Plaintiff's additional evidence reinforces this Court's conclusion that substantial evidence does not support the ALJ's decision.  Plaintiff submitted additional evidence when he sought review by the Appeals Council (AR at 1, 4, 187-90, 469-519), and when new evidence is submitted, the Appeals Council will "evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b); see also Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (stating that medical reports issued after the ALJ's decision are less persuasive than those issued prior to the ALJ's decision).  The Appeals Council "will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).  Here, the Appeals Council determined that Plaintiff's additional evidence "[did] not provide a basis for changing the [ALJ's] decision," and therefore denied review and adopted the decision of the ALJ as the final decision of the Commissioner  Id. at 1-4.

The Ninth Circuit has held that a reviewing court may consider the new evidence—which the Appeals Council has thus made a part of the record—in determining whether the denial of

1  benefits was supported by substantial evidence.[18]  See, e.g., Ramirez v. Shalala, 8 F.3d 1449,

2  1452 (9th Cir. 1993); Smith v. Bowen, 849 F.2d 1222, 1225-26 (9th Cir. 1993).  Thus, although

3  the ALJ did not have the opportunity to review Plaintiff's additional evidence, the Appeals Council

4  considered the information, it became part of the record, and this Court is required to review the

5  record as a whole.  Penny v. Sullivan, 2 F.3d 953, 957 n.7 (9th Cir. 1993).

6          Plaintiff's additional evidence consists largely of medical reports that chronicle his visit to,

7  and subsequent stay at, Sharp Grossmont Hospital in May 2009.  AR at 476-94.  These documents

8  indicate that, although Plaintiff had been taking his medication and abstaining from drugs and

9  alcohol, he was experiencing visual and auditory hallucinations such that Plaintiff's mother felt

10  compelled to bring Plaintiff to the Emergency Department.  Id. at 480-81, 483, 485, 488.   The

11  professional staff at Sharp Grossmont placed Plaintiff in their psychiatric facility after determining

12  that Plaintiff was "Gravely Disabled (unable to provide for [his] own food clothing or shelter)."

13  Id. at 519.   Plaintiff also submitted numerous medical reports from Dr. Edward G. Arevalo

14  spanning from September 2008 to May 2009.  Id. at 496-518.  Dr. Arevalo's reports document

15  Plaintiff's marijuana use and abstention, decreases and increases in Plaintiff's symptoms, and

16  Plaintiff's bouts of medication compliance and noncompliance.  Id. at 496-97, 500-01, 504-05,

17  507-08, 516.  However, Dr. Arevalo never opined on what Plaintiff's limitations or capabilities

18  would be if he stopped using illegal drugs, and Dr. Arevalo's ultimate conclusion was that

19  Plaintiff's disability was permanent and rendered him incapable of performing work.  Id. at 513.

20  Accordingly, the Court finds that when the record as a whole is reviewed, substantial evidence

21  does not support the ALJ's decision that Plaintiff's marijuana use was a contributing factor

22  material to his disability.  See Smith, 849 F.2d at 1225.

23  ///

24

---

25  [18] However, if the Ninth Circuit finds that the denial of benefits was not supported by substantial evidence, it will not award benefits in that situation, but will remand to give the ALJ the opportunity to consider the evidence.

26  See Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) ("While we properly may consider the additional evidence presented to the Appeals Council in determining whether the Commissioner's denial of benefits is supported by

27  substantial evidence, it is another matter to hold on the basis of evidence that the ALJ has had no opportunity to evaluate that [the claimant] is entitled to benefits as a matter of law."). Notably, issues other than the presence or absence of a disability may preclude immediate payment of benefits. See Regennitter v. Comm'r of Soc. Sec. Admin.,

28  166 F.3d 1294, 1300 (9th Cir. 1999) (requiring further proceedings to determine the date on which a claimant became disabled, after finding that disability was established by crediting claimant's and examining physician's testimony).

**B.  The ALJ's Determination of Plaintiff's Credibility**

Plaintiff alleges the ALJ also erred in his assessment of Plaintiff's credibility.  Pl.'s Mot. at 14-17.  Specifically, Plaintiff contends that none of the ALJ's purported rationales supports the finding that Plaintiff's claims are not credible, and the ALJ's determination therefore lacks the support of substantial evidence.  Id.  Defendant argues the ALJ provided valid reasons, supported by substantial evidence in the record, for discounting Plaintiff's credibility.  Def.'s Mot. & Opp'n at 15-17.

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  However, "[f]or the ALJ to reject the claimant's complaints, [he] must provide 'specific, cogent reasons for the disbelief.'"  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (quoting Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990)).  "Once the claimant produces medical evidence of an underlying impairment, the [ALJ] may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence."  Reddick, 157 F.3d at 722 (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991)); see also Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989) ("That a claimant testifies that his symptom is more disabling than would normally be expected gives no valid reason to discount his testimony.").  Moreover, "absent affirmative evidence of malingering, an ALJ cannot reject a claimant's testimony without giving clear and convincing reasons."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing Smolen v. Chater, 80 F.3d 1273, 1283-84 (9th Cir. 1996)).  As such, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints," because "[g]eneral findings are insufficient."  Lester, 81 F.3d at 834; see also Vertigan, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it.").

An ALJ may, however, "disregard self-serving statements made by claimants if it finds them to be incredible on other grounds."  Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting Rashad, 903 F.2d at 1231).  Relevant factors in assessing credibility include "the

claimant's engagement in activities inconsistent with a claim of disability, an unexplained or inadequately explained failure to seek treatment, or other ordinary methods of credibility determination." Sousa, 143 F.3d at 1243 (quoting Bunnell, 947 F.2d at 346)); see also Smolen, 80 F.3d at 1284 (explaining that "ordinary techniques of credibility evaluation" include "the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid."). Ultimately, in order to find Plaintiff's testimony unreliable, the ALJ is required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ's credibility determination should be given "great weight," Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986), and the court may not engage in second-guessing if the ALJ's finding is supported by substantial evidence, Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008), but it is error for a district court to affirm an ALJ's credibility decision based on evidence that the ALJ did not discuss, Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).

Here, after briefly summarizing some of the medical evidence of record, the ALJ concluded, "to the extent that it is alleged that the [Plaintiff] cannot perform work at [his] residual functional capacity . . . those allegations are not totally credible . . . ." AR at 19. The ALJ stated that his determination was founded upon "clear and convincing reasons," namely: (1) Plaintiff's daily activities; (2) Plaintiff's continued marijuana use despite being informed that street drugs would render his medication ineffective; (3) Plaintiff's positive reports regarding the impact of his medication and Plaintiff's irregular adherence to his medication regimen; and (4) the objective medical evidence of record.[19] Id. at 19-20. Although the ALJ determined that "[i]f the [Plaintiff] stopped the substance use, . . . [his] medically determinable impairments could reasonably be expected to produce the alleged symptoms," the ALJ went on to conclude that "the [Plaintiff's]

---

[19] Although the ALJ lists nine "clear and convincing reasons," the second, fourth, and seventh discuss Plaintiff's continued marijuana use; the third, fifth, sixth, and seventh speak to the positive impact of Plaintiff's prescribed medication and/or Plaintiff's noncompliance with his medication regimen; and the eighth and ninth address the objective medical evidence of record. AR at 19-20. Because of the overlap, items two, four, and seven are discussed together, items three, five, six, and seven are discussed together, and items eight and nine are discussed together.

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Id. at 20. Finally, the ALJ stated that "[t]he objective medical evidence and the [Plaintiff's] acknowledged activities are . . . inconsistent with the inability to do any work activity." Id.

The Court finds the ALJ's credibility analysis problematic for several reasons. Although the ALJ states that Plaintiff's statements are not "entirely credible," the ALJ fails to provide any specifics as to what statements are not credible, how those statements relate to Plaintiff's alleged limitations, and how the incredible statements affected the ALJ's disability determination. Moreover, by finding that Plaintiff was disabled but for his marijuana use, the ALJ necessarily believed Plaintiff's statements regarding both his limitations and his illegal drug use, yet the ALJ issued a negative credibility determination. Finally, the ALJ improperly conflates his evaluation of the extent and scope of Plaintiff's disability with his determination of Plaintiff's credibility.[20] Despite these frailties, the Court will nonetheless review the ALJ's proffered "clear and convincing reasons" for finding Plaintiff "not totally credible."

1. Daily Activities

Plaintiff states that the daily activities cited by the ALJ are accurate, but argues that those activities do not implicate the kind of mental capacity—which Plaintiff claims he lacks—that would be required in the workplace. Pl.'s Mot. at 15. Defendant counters that Plaintiff's activities were inconsistent with his alleged limitations and instead indicate the extent of Plaintiff's functionality. Def.'s Mot. & Opp'n at 17.

The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability." Vertigan, 260 F.3d at 1050; see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (internal citations omitted) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for

---

[20] Because the ALJ's credibility determination is intertwined with the disability determination, the Court incorporates its analysis of the ALJ's medical evaluation, set forth in Section A (supra pp. 19-27), into this discussion of the ALJ's evaluation of Plaintiff's credibility.

benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). However, "daily activities may be grounds for an adverse credibility finding if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (internal quotation marks and citation omitted).

Here, the ALJ stated that Plaintiff's daily activities include:

> [I]ndependently caring for his own personal hygiene; independently taking his medications; preparing his own food; shopping for his own groceries; doing laundry and ironing; performing light household chores, such as making his bed, vacuuming, cleaning the bathroom; he can go out alone and walk up to one mile at a time, or independently use public transportation; watch television; and listen to his friends rap at the studio.

AR at 19.   The ALJ concluded that "[t]hese activities do not indicate a disabling level of impairment of [Plaintiff's] residual functional capacity."   Id.   Plaintiff does not dispute the list of his daily activities, but asserts that his administrative hearing testimony and reports from Dr. Barros indicate his work limitations involve adhering to authority, getting along with peers, and staying focused.   Pl.'s Mot. at 15.   Plaintiff argues that the activities cited by the ALJ "do not implicate the kind of mental capacity that forms the core of [Plaintiff's] disability claim" and "simply do not implicate the kind of mental focus, social skills, or even temperament that would be required in the workplace."   Id.   Defendant contends that Plaintiff is actually "quite functional," and notes Plaintiff's ability to attend Catalyst, perform chores, socialize, purchase his own food, and maintain romantic relationships as evidence of this proposition.[21]   Def.'s Mot. & Opp'n at 17. Defendant likens Plaintiff to the non-disabled claimant in Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005), who was "able to take care of her own personal needs, cook, clean and shop" and "interact[] with her nephew and her boyfriend," as well as the non-disabled claimant in Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999), who was able to "fix meals, do

---

[21] Although Defendant's argument is corroborated by Plaintiff's administrative hearing testimony and evidence in the record (AR at 32-33, 294, 364), the ALJ referenced neither Plaintiff's attendance at Catalyst nor his romantic partners in his written decision.  As such, the Court cannot consider this information in reviewing the ALJ's credibility determination.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts.").

1   laundry, work in the yard, and occasionally care for his friend's child." Id.

2       This credibility determination is inconsistent with the ALJ's disability determination.  As

3   summarized above, the ALJ apparently found that Plaintiff's ability to engage in the stated daily

4   activities is inconsistent with Plaintiff's claim that he is unable to work.  AR at 19.  While such a

5   determination may be appropriate (Morgan, 169 F.3d at 599 (contradictions between claimant's

6   reported activities and his asserted limitations properly considered in determining credibility)), it

7   does not fit the facts of this case.  Here, the ALJ found that Plaintiff was disabled but for his illegal

8   drug use.  AR at 15-16.  As such, the ALJ had to believe some, if not all, of the Plaintiff's and

9   treating physician's statements about Plaintiff's work limitations.  The ALJ fails to adequately

10  explain which statements he was rejecting and why and how the incredible statements impact the

11  ALJ's disability determination.  For example, the ALJ fails to state how Plaintiff's ability to engage

12  in daily activities affects Plaintiff's drug use and/or the ALJ's determination that the drug use is

13  material to Plaintiff's disability.  Similarly, the ALJ does not explain how Plaintiff's physical ability

14  to engage in his daily activities undermines his claimed inability to handle the mental and

15  emotional demands of the workplace.  Finally, the ALJ repeatedly states that the Plaintiff is not

16  "totally" or "entirely" credible and discounts statements regarding "intensity, persistence and

17  limiting effect of the[] symptoms" but does not provide any specific analysis or explanation.  The

18  Court therefore finds that the ALJ's credibility determination based upon Plaintiff's daily activities

19  cannot be upheld because the ALJ failed to provide the requisite clear and convincing reasons

20  with sufficient specificity to enable the Court to conclude that the ALJ did not arbitrarily discredit

21  Plaintiff's testimony.  See Thomas, 278 F.3d at 958; see also Vertigan, 260 F.3d at 1050.

22      2. Marijuana Use

23      Plaintiff argues that the ALJ's rationale regarding Plaintiff's marijuana use does not bear

24  on his credibility.  Pl.'s Mot. at 15.  Plaintiff highlights his candid admissions of intermittently

25  smoking marijuana and further points out that no doctor remarked that Plaintiff's symptoms were

26  affected by his marijuana use.  Id.  Defendant simply contends that Plaintiff's credibility is

27  undermined because he continued to smoke marijuana despite medical advice to stop doing so.

28  Def.'s Mot. & Opp'n at 16-17.

1       Of the ALJ's nine "clear and convincing" reasons why allegations of Plaintiff's inability to

2   work were "not totally credible," three of the reasons focus on Plaintiff's cannabis use.  AR at 19-

3   20.  Plaintiff contends that the ALJ's reliance on Plaintiff's marijuana use for finding his complaints

4   not credible is improper because Plaintiff was forthright about his marijuana use.  Pl.'s Mot. at 15.

5   Plaintiff also asserts that the ALJ is "attempt[ing] to use the fact of [Plaintiff's] use of marijuana

6   to the detriment of his claim when, in fact, no doctor has stated that his [mental illness] is

7   affected by his smoking habit."  Id.  Plaintiff further argues that Dr. Barros was well aware of

8   Plaintiff's marijuana use, but this substance abuse did not affect her professional opinion that

9   Plaintiff was limited in mental function such that he was unable to work.  Id.  Defendant, after

10   citing Plaintiff's admissions of marijuana use in August 2007, as well as January, June, and July

11   2008, asserts that "Plaintiff's continued use of marijuana, despite medical advice to stop, further

12   undermined his credibility."  Def.'s Mot. & Opp'n at 16-17.  In support, Defendant cites Fair v.

13   Bowen, 885 F.22d 597 (9th Cir. 1989), seemingly for the proposition that an ALJ may discount

14   a claimant's testimony if there is evidence of "an unexplained, or inadequately explained, failure

15   to seek treatment or follow a prescribed course of treatment."[22]  Id. at 603.

16       Presumably, the ALJ repeatedly references Plaintiff's continued marijuana use because if

17   "using street drugs would cause [Plaintiff's] prescribed medications to be ineffective," then

18   Plaintiff's heightened symptoms can be attributable to Plaintiff's substance abuse.  AR at 19.

19   However, this conclusion—that Plaintiff's cannabis use explains Plaintiff's increased symp-

20   toms—simply assumes too much.  By relying on this reasoning, the ALJ not only conflates his

21   credibility determination with his materiality of substance abuse determination, but he also

22   furthers a proposition that lacks the support of substantial evidence.  As previously discussed (see

23   supra pp. 21-26), the only support in the record for this proposition stems from Beatrice Lewis,

24   L.C.S.W., a Senior Psychiatric Social Worker, who spent thirty minutes with Plaintiff on November

25   8, 2006, and typed in her notes: "It is impressed upon [Plaintiff] that street drugs will cause his

---

27       [22] Although Defendant asserts that "[t]he ALJ pointed to Plaintiff's continued drug abuse as [an] instance of
non-compliance with prescribed treatment," Defendant fails to indicate where in the record any physician prescribed
Plaintiff a course of treatment premised upon abstention from marijuana.  Def.'s Mot. & Opp'n at 16.  The Court finds

28   that Plaintiff's continued marijuana use cannot be construed as a failure to follow a prescribed course of treatment
if no physician ever instructed Plaintiff to wholly refrain from smoking marijuana.

1    prescribed medications to be ineffective."[23]  AR at 200.   As Plaintiff argues, no other physician

2    opined on the matter, and Dr. Barros never negatively implicated Plaintiff's marijuana use in any

3    of her numerous medical assessments of him.

4           The ALJ rationalizes Plaintiff's "increased symptoms, when he was seen by Dr. Barros, on

5    January 18, 2007," as the result of Plaintiff's "having smoked two days earlier."  AR at 19.

6    However, nothing in Dr. Barros's January 18, 2007 report confirms this presupposed causal link,

7    and the ALJ did not cite anything from Dr. Barros or any other physician in support of this

8    contention.  See Brawner v. Sec'y of Health & Human Svcs., 839 F.2d 432, 433-34 (9th Cir. 1988)

9    ("The ALJ may only disregard the opinion of a treating physician if there are specific and

10   legitimate reasons based on substantial evidence, and he must set forth a thorough summary of

11   the facts and conflicting clinical evidence used in reaching that decision.").   Instead, the ALJ

12   seemingly relies on Ms. Lewis's one cautionary statement to justify his conclusion that Plaintiff's

13   marijuana use triggered Plaintiff's increased symptoms.  The ALJ's conclusory reasoning, without

14   sufficient explanation or corroboration, highlights the paucity of evidence in support of the

15   contention that Plaintiff's marijuana use did, in fact, render his medications ineffective and trigger

16   heightened symptoms.

17          The Court finds that the ALJ's reliance on Plaintiff's marijuana use to make a negative

18   credibility determination lacks the requisite support of substantial evidence.  See Tommasetti, 533

19   F.3d at 1039.  Moreover, the Court finds that the ALJ failed to include sufficiently specific findings

20   to support his negative credibility determination based upon Plaintiff's marijuana use.  See

21   Thomas, 278 F.3d at 958 (stating that the ALJ is required to make "a credibility determination

22   with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily

23   discredit [Plaintiff's] testimony.").

24   ///

25

26        [23] The Court takes further issue with the ALJ's reliance on Ms. Lewis's blanket statement because she did not
     indicate precisely how marijuana would negatively impact Plaintiff's medication regimen nor did she specify which
     medication(s) would be negatively impacted.  Notably, at the time of Plaintiff's assessment at San Diego County
27   Psychiatric Hospital, "[t]he only medication he [was] currently on [was] Depakene 250 mg which he [had] taken for
     the past month." AR at 199. However, Staff Psychiatrist Dr. Kang then advised Plaintiff to discontinue the Depakene,
28   and he gave Plaintiff a prescription for Seroquel and Strattera. Id. at 196.  Subsequently, Dr. Barros prescribed
     Plaintiff Remeron. AR at 208.

### 3. Effect of Medication and Medication Compliance

Plaintiff also challenges the ALJ's conclusion that Plaintiff's inconsistent medication compliance and sporadic reports of improvement undermine his credibility. Pl.'s Mot. at 15-16. Plaintiff asserts that his intermittent noncompliance is due to, and reasonably explained by, his disabling psychological symptoms. Id. at 16.  Defendant states that because Plaintiff improved with medication, his alleged limitations were not credible. Def.'s Mot. & Opp'n at 16.  Moreover, Defendant asserts that noncompliance is a legitimate credibility consideration.  Id.

"In order to get benefits, [a claimant] must follow treatment prescribed by [his] physician if this treatment can restore [the claimant's] ability to work . . . ." 20 C.F.R. § 416.930(a); see also Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").  Accordingly, in his credibility determination, an ALJ may consider an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment . . . ." Smolen, 80 F.3d at 1284.  Notably, "[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004); see also 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .").  "While there are any number of good reasons for not [seeking treatment or following a prescribed course of treatment], a claimant's failure to assert one, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." Fair, 885 F.2d at 603 (internal citations omitted).  In evaluating a claimant's symptom severity, an ALJ may consider relevant factors such as "[t]he type, dosage, effective-ness, and side effects of any medication" the claimant takes or has taken to alleviate symptoms, as well as "[t]reatment, other than medication," the claimant receives or has received for symptom relief.  20 C.F.R. § 416.929(c)(3)(iv).

Four of the ALJ's asserted reasons for discounting Plaintiff's credibility focus on Plaintiff's fluctuating compliance with his medication regimen and/or Plaintiff's personal reports regarding the impact of his medication. AR at 19-20.  Specifically, the ALJ cites the fact that on January 4,

2007, Plaintiff "reported that he had been taking his medications of Seroquel and Strattera as prescribed and his only side-effect was feeling tired; however, he said the medication calmed him down and decreased his tendency to get angry." Id. at 19.  The ALJ then points out that on April 2, 2007, Plaintiff "reported that he will forget or sometimes just not take his medications, but it was difficult to obtain clear information from [Plaintiff]." Id.  Relying on 20 C.F.R. § 416.930, the ALJ states that "[s]ince there were no allowable reasons offered for [Plaintiff] not taking his medications as directed, [Plainitff] can be denied benefits based on this regulation." Id. at 19-20.  However, the ALJ further states that "also during the April 2, 2007 follow-up, [Plaintiff] admitted that he felt calmer when he was taking his medications." Id. at 20.  Finally, the ALJ states that "in the psychiatric/psychologist impairment questionnaire completed on July 16, 2008, by Dr. Barros, it was noted that [Plaintiff's] compliance with medications was minimal to moderate . . . ."[24]  Id.

Plaintiff argues that his "failure to diligently adhere to his physicians' advice" is due to his documented psychological symptoms, such as inattention, thought disorganization, and poor judgment.  Pl.'s Mot. at 16.  Plaintiff further asserts that, according to the regulations, "an explanation for the noncompliance must be solicited before benefits can be denied, as there may be good reasons for failure to comply with medical advice."[25]  Id. (citing 20 C.F.R. § 404.1530(a)).  Plaintiff contends that the ALJ did not question Plaintiff regarding his sporadic compliance, and that Plaintiff's symptoms "may certainly provide a reasonable explanation for his failure to fully comply with his prescribed regimen."  Id.

---

[24] The Psychiatric/Psychological Impairment Questionnaire completed on July 16, 2008 is the final report in the record from Dr. Barros.  Id. at 270-77.  In the questionnaire, Dr. Barros diagnosed Plaintiff as having Schizoaffective Disorder, ADHD, and Cannabis Dependence.  Id. at 270.  She assigned him a GAF score of 45, and she described Plaintiff's compliance to medication as "minimal to moderate," noting that he "periodically still smokes cannabis."  Id.  Dr. Barros listed Plaintiff's primary symptoms as "depression, poor concentration, periodic auditory hallucinations, ideas of reference and persecution, anxiety, anger and explosiveness," and she indicated that they are all frequent and severe.  Id. at 272.  She indicated that Plaintiff was incapable of even low work stress and added that he "does not want people to tell him what to do."  Id. at 276.  Dr. Barros also remarked that Plaintiff was "most probably not" a "malingerer," that Plaintiff started hearing voices around age 18, and that Plaintiff would be absent from work "[m]ore than three times a month," on average, due to his "impairments or treatment."  Id. at 276-77.

[25] 20 C.F.R. § 404.1530(a) provides: "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  Presumably, Plaintiff intended to cite subsection (b), which states: "If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."  20 C.F.R. § 404.1530(b).

The Court finds that the ALJ's negative credibility determination based upon Plaintiff's noncompliance with his prescribed treatment lacks the support of substantial evidence in the record.  At Plaintiff's administrative hearing, the ALJ only asked Plaintiff why he was taking medication; he did not inquire about Plaintiff's compliance or experiences with his medication.  AR at 35.  Plaintiff argues that his noncompliance can be reasonably explained by his underlying mental impairments, and the Court is loath to underestimate the fact that "mental illness in general . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment."  Kangail v. Barnhart, 454 F.3d 627, 630 (7th Cir. 2006).  Although the ALJ cites Plaintiff's occasional reports of experiencing positive effects from his medication (AR at 19-20), the ALJ, without explanation, fails to reference the medical reports in which Plaintiff was taking his medication yet experiencing heightened symptoms.  AR at 211, 214-15.  Moreover, even though Plaintiff sometimes reported that his medication elicited positive effects, no physician ever specifically opined that Plaintiff's impairments were "controlled effectively with medication." Warre, 439 F.3d at 1006.   Accordingly, the Court finds that the ALJ's negative credibility determination premised upon Plaintiff's noncompliance lacks the requisite support of substantial evidence in the record.  See Tommasetti, 533 F.3d at 1039.

### 4. Objective Medical Evidence

Finally, Plaintiff argues that the ALJ's contention regarding a lack of objective medical evidence in the record is simply without merit and runs afoul of the relevant law.  Pl.'s Mot. at 16-17.  Defendant, in response, cites examinations in which Plaintiff exhibited normal mood, thought content, and insight.  Def.'s Mot. & Opp'n at 15-16.

"Objective medical evidence" means "medical signs and laboratory findings as defined in [the Social Security Administration regulations]."  20 C.F.R. § 416.929(a).  Signs are "abnormalities which can be observed, apart from [a claimant's] statements," and "must be shown by medically acceptable clinical diagnostic techniques."  20 C.F.R. § 416.928(b).  Specifically, "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities . . . of behavior, mood, thought, memory, orientation, development, or perception." Id.  Psychiatric signs "must also be shown by observable facts that can be medically described

and evaluated." Id.  Laboratory findings are "phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques," such as chemical and psychological tests. 20 C.F.R. § 416.928(c).  "Once the claimant produces medical evidence of an underlying impairment, the [ALJ] may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." Reddick, 157 F.3d at 722 (citing Bunnell, 947 F.2d at 343); see also Vertigan, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it.").

Notably, the opinions of treating physicians are given greater weight than the opinions of other physicians, and as such, "an ALJ may not reject treating physicians' opinions unless he makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Smolen, 80 F.3d at 1285 (internal quotation marks and citation omitted). If the treating physicians' opinions are uncontroverted, the ALJ's reasons for rejecting those opinions must be clear and convincing.  Smolen, 80 F.3d at 1285.  When there is conflicting medical evidence, an ALJ can meet [the 'specific, legitimate reasons'] burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings."  Magallenes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

The final two asserted reasons for discrediting Plaintiff's claims focus on the objective evidence of Plaintiff's medical record.  AR at 19-20.  The ALJ first states, "when discussing [Plaintiff's] impairments, no physician, neither any of [Plainitff's] treating physicians or a State Agency physician ever opined that listing level limitations were ever met or equaled." Id. at 20. The ALJ then further states that "the objective evidence of [Plaintiff's] medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months." Id. Plaintiff argues that the ALJ's reasoning is flawed because the law does not require objective proof of medical disability.  Pl.'s Mot. at 16.  Regardless, Plaintiff asserts that his treating psychiatrists' opinions and findings fit the definition of "objective medical evidence" under the regulations.  Id. at 16-17.  In response, Defendant cites Plaintiff's

"normal mental status examinations on numerous occasions" as well as Plaintiff's multiple reports that he was "doing fine." Def.'s Mot. & Opp'n at 15-16.  Defendant therefore contends that the objective medical evidence contradicted Plaintiff's testimony, and as such, the ALJ had a valid basis to find Plaintiff not fully credible.  Id.

As an initial matter, the Court finds that the medical evidence of record contradicts the ALJ's assertion that no physician ever opined on whether Plaintiff's impairments met listing level limitations.  AR at 20.  Physicians and State Agency medical consultants repeatedly diagnosed Plaintiff as having a condition that "meets or equals" more than one listing.  See, e.g., AR at 106, 107, 197, 201, 204, 233, 255, 264, 266, 268, 270, 355, 468.  Presumably, the ALJ meant that no physician diagnosed Plaintiff in the absence of his substance use, and Plaintiff's substance use exacerbated his "condition" to the extent that it made otherwise non-disabling impairments disabling.[26]  If this is, in fact, the ALJ's assertion, the Court finds that such a conclusion is premised upon the ALJ's own logic and lacks proper evidentiary support in the record.[27]

Furthermore, although the ALJ briefly summarized the medical evidence of record in his written opinion, the Court finds that the ALJ's statement, "the objective evidence of [Plaintiff's] medical record does not establish [disabling] impairments," is simply too conclusory.  AR at 20. Despite the ALJ's qualification that his credibility determination is  based upon "clear and convincing reasons," the ALJ fails to provide the requisite specificity and clarity in his analysis. In concluding that the objective medical evidence of record fails to establish Plaintiff's disability, the ALJ necessarily rejected the opinion of treating physician Dr. Barros, who repeatedly opined that Plaintiff was unable to work due to his disabling impairments.  AR at 106, 107, 201, 264, 268. However, the ALJ neither supports nor explains his rejection of Dr. Barros's opinion with "specific, legitimate reasons . . . that are based on substantial evidence in the record."  Smolen, 80 F.3d at 1285.  Moreover, the medical reports in the record indicating Plaintiff's impairments cover a

---

[26] At the outset of his written opinion, the ALJ states that Plaintiff's "substance use disorder meets listings 12.04 and 12.09."  AR at 15.  Rather than being a mere typographical error, this statement indicates the ALJ's belief that Plaintiff's substance use is determinative of the severity of Plaintiff's impairments: The ALJ went on to conclude that "the [Plaintiff's] substance use disorder causes at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation . . . ."  Id.

[27] See supra pp. 21-26.

span of two years, thereby refuting the ALJ's conclusion that the objective medical evidence "does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months."[28]  AR at 20.

## CONCLUSION

For the foregoing reasons, this Court finds that the ALJ's decision in this case was neither supported by substantial evidence nor free from legal error and should therefore be remanded for a new hearing and decision consistent with this Report and Recommendation.  Accordingly, this Court **RECOMMENDS** that Defendant's cross-motion for summary judgment be **DENIED** and Plaintiff's motion for summary judgment be **GRANTED IN PART AND DENIED IN PART**.

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties **no later than May 20, 2011**.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties **no later than June 10, 2011**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**


DATED:  April 29, 2011

Barbara Major
_____
BARBARA L. MAJOR
United States Magistrate Judge

---

[28] Notably, at the outset of his opinion, the ALJ stated that Plaintiff "has the following severe combination of impairments: schizoaffective disorder; attention deficit/hyperactivity disorder (ADHD); and a substance abuse disorder," and that "these are medically determinable impairments that have lasted more than 12 months . . . ."  AR at 15.

10cv1451-JLS (BLM)